**ACCU PERSONNEL, INC., Plaintiff,**

v.

**ACCUSTAFF, INC., Defendant.**

**Civ. A. No. 93–30 MMS.**

United States District Court,
D. Delaware.

Feb. 18, 1994.

---

Jeffrey B. Bove and R. Eric Hutz of Connolly, Bove, Lodge & Hutz, Wilmington, DE; Mark D. Simpson and Donald C. Simpson, of Simpson & Simpson, P.C., Moorestown, NJ, of counsel, for plaintiff.

Robert H. Whetzel of Richards, Layton & Finger, Wilmington, DE; Laurence R. Hefter and David M. Kelly of Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, DC, of counsel, for defendant.

## OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

### I. INTRODUCTION

■ Plaintiff, ACCU PERSONNEL, INC., ["ACCU"] has filed suit against defendant ACCUSTAFF, INC. ["ACCUSTAFF"][1] alleging trademark infringement,[2] unfair competition, and deceptive trade practices under the Lanham Act, 15 U.S.C. § 1125(a) (1988), the Delaware Uniform Deceptive Trade Practices Act, Del.Code tit. 6, § 2531 et seq. (1974) [the "Delaware Act"], and the common law. Docket Item ["D.I."] 1. The Court has subject matter jurisdiction over plaintiff's Lanham Act claim pursuant to 28 U.S.C. § 1338(a). The related state statutory and common law claims fall within the Court's supplemental jurisdiction pursuant to 28 U.S.C. §§ 1338(b) and 1367(a).

This opinion addresses defendant's motion for partial summary judgment (D.I. 81), in which defendant argues: (1) defendant is a geographically remote, good faith user of its trademark; (2) plaintiff's claims under the law of Delaware should be dismissed because plaintiff has no trademark rights in Delaware; (3) plaintiff is not entitled to either actual or increased damages because plaintiff can show no instances of actual confusion leading to lost sales; and (4) plaintiff is not entitled to an accounting of profits, punitive damages or attorneys' fees because defendant has not acted in bad faith. D.I. 82.

---

1. Plaintiff originally named as an additional defendant BSI Temporaries, Inc., which was one of the four independent regional companies merged into defendant AccuStaff, Inc. on May 4, 1992. D.I. 47 at ¶ 2. All claims against BSI Temporaries, Inc. have been dismissed. See D.I. 75.

2. More accurately, plaintiff alleges infringement of a service mark. D.I. 1. The Lanham Act defines a service mark as "a mark used in the sale or advertising of services to identify the services of one person and distinguish them from the services of others." 15 U.S.C. § 1127 (1982).

By comparison, a trademark is "any work, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others." Id. The statute "generally applies the same principles concerning ... protection to both trade and service marks." Country Floors, Inc. v. Gepner, 930 F.2d 1056, 1064 n. 2 (3d Cir.1991). Although this is a service mark case, for ease of reference, the Court will use the term "trademark" in this opinion.

For the reasons which follow, defendant's motion for partial summary judgment will be granted in part and denied in part. Summary judgment will be granted defendant as to: whether defendant made geographically remote, good faith use of its trademark; whether plaintiff is entitled to actual damages, an accounting of profits, increased damages, punitive damages and treble damages; and whether plaintiff is entitled to attorneys' fees. Summary judgment will be denied defendant as to whether plaintiff properly brings claims under the law of Delaware.

## II. FACTUAL BACKGROUND

### A. Plaintiff's Adoption and Use of Its Mark

Plaintiff, incorporated in New Jersey on March 13, 1980, currently has four offices, all of which are located in New Jersey. D.I. 1 at 2. The main office, in Pennsauken, is located on Route 38, approximately six miles from the Ben Franklin Bridge, which connects Center City Philadelphia, Pennsylvania with Southern New Jersey. D.I. 98 at ¶ 3. Plaintiff also has offices in Burlington, Cherry Hill and Woodbury Heights. *Id.* at ¶ 4; D.I. 84 at A83–A89. Plaintiff's Burlington office is located within two miles of the Bur-

lington Bristol Bridge, connecting New Jersey to Bristol, Pennsylvania. D.I. 98 at ¶ 4.

### 1. Plaintiff's Sales Activity

In its opening brief in support of its motion for a preliminary injunction, plaintiff claimed to have customers in twenty-nine states. D.I. 29 at 27. As defendant points out, this statement is based upon "Customer Lists" which plaintiff created on March 9, 1993 specifically for this litigation. *See* D.I. 83 at A6–A87; D.I. 84 at A93–A102. Defendant further notes that in creating these "Customer Lists," plaintiff did not consider the following information for use as a customer address: where the job orders originated; where the client contact was located; or where the services were rendered. D.I. 82 at 8. Instead, according to Edward J. Damm, plaintiff's Secretary and Executive Vice President, a customer was listed as "out-of-state" if: (1) plaintiff sent an invoice to an out-of-state address; (2) plaintiff received payment from an out-of-state address; or (3) plaintiff signed a contract out-of-state. D.I. 84 at A97–A99. Plaintiff does not dispute these or the following facts pertaining to its sales activity unless otherwise noted. D.I. 89 at 4.

As defendant has summarized in a chart, assuming every customer designated "out-of-state" is indeed located out-of-state, plaintiff's customers are distributed as follows:

| Year | Total[3] Customers | Southern New Jersey | Southeastern Pennsylvania | Other Areas |
|------|------|------|------|------|
| 1991 | 546 | 503 | 19 | 24 |
| 1992 | 648 | 566 | 22 | 60 |
| 1993[4] | 256 | 239 | 8 | 9 |

D.I. 83 at A88–A92.[5] Those customers gen-

erated the following sales:

**3.** In constructing this chart, defendant included only those customers on the "Customer Lists" having any sales activity. D.I. 82 at 9 n. 6.

**4.** As noted previously, plaintiff compiled its sales activity information on or around March 9, 1993. Any reference to the information contained in the

1993 "Customer List," therefore, necessarily is limited to the first few months of that year.

**5.** Plaintiff has notified defendant that because of a computer problem, the 1990 "Customer List" contains only a small fraction of plaintiff's total sales during that year. Accordingly, defendant

| Year | Total Sales [6] | Southern New Jersey | Southeastern Pennsylvania | Other Areas |
|---|---|---|---|---|
| 1991 | $ 8,446,802 | $ 8,243,144 | $103,894 | $ 99,764 |
| 1992 | $ 8,938,476 | $ 7,315,118 | $607,245 | $1,016,113 |
| 1993 | $ 1,570,847.33 | $ 1,340,947.89 | $ 52,104.16 | $ 177,795.28 |
| TOTAL | $18,956,125.33 | $16,899,209.89 | $763,243.16 | $1,293,672.28 |

*Id.*

In fact, however, defendant has compiled numerous documents supporting these sales which indicate that: (1) orders by most of the customers designated "out-of-state" emanated from within Southern New Jersey; and (2) the contact persons employed by these customers also are located within Southern New Jersey. *Id.* at A93–A332. Plaintiff has not placed into evidence any documents to the contrary. Taking into account this information, and reclassifying, when appropriate, the customers designated "out-of-state" as customers within Southern New Jersey, plaintiff's customers are as follows:

| Year | Total Customers | Southern New Jersey | Southeastern Pennsylvania | Other Areas |
|---|---|---|---|---|
| 1991 | 546 | 516 | 21 | 9 |
| 1992 | 648 | 611 | 24 | 13 |
| 1993 | 256 | 239 | 10 | 7 |

*See id.* at A333–A335.

At issue are the last two columns containing plaintiff's sales to customers in two disputed trade areas: Southeastern Pennsylvania and Northern Delaware. The following sections contain a more detailed summary of sales, by trade area, based on a summary compiled by defendant. Plaintiff, while conceding this summary is correct, focuses its attention upon the economic relationship among Southern New Jersey, Southeastern Pennsylvania, and Northern Delaware—commonly known as the "Delaware Valley." According to plaintiff, that economic relationship is most determinative of whether plaintiff has penetrated the markets in Southeastern Pennsylvania and Northern Delaware. D.I. 89 at 6–10. In support of this theory, plaintiff has filled the record with various sources recognizing the existence of the Delaware Valley. *See* D.I. 96 at B1–B21.

### a. Plaintiff's Sales Activity in Southeastern Pennsylvania

Plaintiff's 1991, 1992, and 1993 "Customer Lists" identify nineteen, twenty-two and eight customers, respectively, for total sales of $763,249.16 in Southeastern Pennsylvania. D.I. 83 at A6–A87, A88–A92, A439–A443. The geographic breakdown of those customers is as follows:

has not analyzed sales activity for that year. D.I. 82 at 9 n. 7.

6. The Court has corrected for a computational error of $202,509.54 present in the grand total boxes of defendant's summary of sales. *See id.*

| City | 1991 Number of Customers | 1992 Number of Customers | 1993 Number of Customers |
|---|---|---|---|
| Aston | 0 | 0 | 1 |
| Bala Cynwyd | 1 | 1 | 0 |
| Bensalem | 1 | 2 | 1 |
| Bristol | 7 | 3 | 2 |
| Frazier | 0 | 1 | 0 |
| Hatfield | 0 | 0 | 1 |
| Lehigh Valley | 0 | 1 | 0 |
| Lester | 1 | 1 | 0 |
| Malvern | 0 | 1 | 0 |
| Newtown | 0 | 0 | 1 |
| Philadelphia | 8 | 11 | 2 |
| Reading | 0 | 1 | 0 |
| Valley Forge | 0 | 1 | 0 |
| Warrington | 1 | 0 | 0 |
| TOTAL | 19 | 23 [7] | 8 |

*Id. Cf.* D.I. 84 at A177 (map depicting listed cities). As defendant asserts, and plaintiff does not dispute, many of plaintiff's customers in Southeastern Pennsylvania represent isolated sales for relatively small amounts of money, such as a few hundred to a few thousand dollars. *See* D.I. 83 at A25–A26, A52–A53, A85–A86, A439–443. The following chart summarizes the number of customers in Southeastern Pennsylvania which account for less than $2,500 in annual sales:

| Year | Customers With Sales of Less Than $2,500 | Total Customers |
|---|---|---|
| 1991 | 11 | 19 |
| 1992 | 14 | 22 |
| 1993 | 5 | 8 |
| TOTAL | 30 | 49 |

*Id.*

After taking into account the double or triple counting of those customers represented in more than one year, plaintiff sells to a total of thirty-four different customers scattered through Southeastern Pennsylvania. *Id.* Further, the documents supporting these sales indicate that of those thirty-four, at least eighteen are, in fact, more accurately classified as customers located in Southern New Jersey. D.I. 83 at A93–A332; D.I. 103 at C1–C92. The customers are ASI, Boscov's, Day Products, The Equitable, Kiddie City, Lou Ziapone, Morris Flamingo, Penn Linen, Pep Boys, Philadelphia Daily News, Philadelphia Focus, Philadelphia Inquirer, A. Pomerantz, Pro Built, Rouse & Associates, Storer Cable, TRW and Wee Three Records.[8] *Id.* For these eighteen, the "Job Orders" and "Sales History Reports" predominantly contain customer addresses not in Southeastern Pennsylvania, but in Southern New Jersey. D.I. 83 at A93–A332, A444–A450; D.I. 103 at C1–C92. In addition, three of them—Day Products, Pep Boys, and Penn Linen—account for 65.737% of plaintiff's total sales, over the three years, by dollar volume in what plaintiff has termed "Southeastern Pennsylvania." D.I. 83 at 6–87, 439–443. According to the "Customer Lists," the eighteen customers and their sales figures are distributed as follows:

7. In this chart, defendant has listed a total of twenty-three customers, rather than twenty-two, in Southeastern Pennsylvania for 1992. The Court was unable to find the error, but in any event, it makes little difference, especially in light of the fact plaintiff has conceded these figures are correct.

8. Plaintiff does not dispute the conclusion that six of these eighteen have more sales activity in Southern New Jersey: Boscov's, Day Products, Penn Linen, Pep Boys, Rouse & Associates, and TRW. D.I. 82 at 12; D.I. 89 at 4. Because defendant first mentioned the other twelve in its reply brief, D.I. 102 at 3, plaintiff has had no opportunity to concede anything with respect to these twelve. At no time, however, has plaintiff placed any evidence in the record suggesting defendant has reclassified these customers in error.

| Customer | 1991 | 1992 | 1993 |
|---|---|---|---|
| ASI | $2,540 | $ 4,999 | 0 |
| Boscov's | 0 | $ 1,527 | 0 |
| Day Products | 0 | $330,926 | 0 |
| The Equitable | $ 528 | $ 54 | 0 |
| Kiddie City | $1,095 | $ 8,753 | 0 |
| Lou Ziapone | $ 186 | 0 | 0 |
| Morris Flamingo | 0 | 0 | $654.82 |
| Penn Linen | 0 | $121,521 | 0 |
| Pep Boys | 0 | $ 39,289 | 0 |
| Philadelphia Daily News | $ 403 | 0 | 0 |
| Philadelphia Focus | $ 13 | 0 | 0 |
| Philadelphia Inquirer [9] | 0 | 0 | 0 |
| A. Pomerantz | $ 845 | $ 2,091 | 0 |
| Pro Built | $ 2,330 | $ 1,788 | $1,165 |
| Rouse & Associates | 0 | $ 1,431 | 0 |
| Storer Cable | 0 | $ 2,537 | 0 |
| TRW | $16,269 | 0 | 0 |
| Wee Three Records | $ 9,759 | 0 | 0 |
| TOTAL OVER THREE YEARS | | | $550,703.82 |

D.I. 83 at A6–A87. Documentation is not available for earlier years. During 1988 and 1989, however, plaintiff estimates it placed forty to sixty persons per week in Bristol and Fairless Hills, Pennsylvania for K–Mart, Total Warehouse, and Toys–R–Us. D.I. 98 at ¶¶ 9–10. Plaintiff attributes the subsequent decline in sales to those companies to "the current economic recession." *Id.* *See* D.I. 83 at A26 (no sales in 1991), A52 (sales figure obscured in 1992), A86· (no sales in 1993).

### b. Plaintiff's Sales Activity in Northern Delaware

Plaintiff's 1991 "Customer List" identifies one customer in Delaware, "Int'l Mill Svc., Inc.," for sales of $98. D.I. 83 at A6. The 1992 "Customer List" identifies two customers in Delaware: Int'l Mill Svc., Inc. for no sales; and Western Fumigation for sales of $3,513. *Id.* at A27. Finally, the 1993 "Customer List" identifies no customers in Delaware. *See id.* at A54. Total sales are therefore $3,611. *Id.* at A88.

Plaintiff's "Job Orders" and "Invoice Files" reveal the extent of its contacts with these two customers, contacts which defendant argues are virtually nonexistent. D.I. 82 at 10.

With respect to Int'l Mill Svc., Inc., each supporting document containing an address indicating that while the orders may have originated from Claymont, Delaware, the temporary employees worked in either Cinnaminson or Riverton, New Jersey. D.I. 83 at A393–A438.

As for Western Fumigation, the documents reveal that: (1) forty-five of forty-nine job orders required work to be performed in Lester, Pennsylvania, which is located near Philadelphia, by over three hundred temporary employees (D.I. 83 at A336–A389); (2) the other four of forty-nine job orders required work to be performed in Wilmington, Delaware, by four temporary employees (*id.*); (3) plaintiff sent invoices for the job orders to Lester (*id.* at A390–A391); and (4) Western Fumigation sent plaintiff a check bearing an address in New Jersey (*id.* at A392). Documentation is not available for earlier years. During 1988 and 1989, however, plaintiff estimates it placed fifty to sixty temporary employees in jobs for Western Fumigation, both in Delaware and Pennsylvania. D.I. 98 at ¶ 7. Plaintiff attributes the subsequent "considerable" drop in business, documented above, to "union problems." *Id.* at ¶ 8.

9. For whatever reason, the Court was unable to locate any sales to the Philadelphia Inquirer in the "Customer Lists." *See* D.I. 83 at A25–A26 (1991), A52–A53 (1992), A86 (1993).

## 2. Plaintiff's Anticipated Sales Activity

Plaintiff highlights three areas in which it expects to increase its placement of temporary employees in 1994. Defendant, for its part, contends expected increases are irrelevant. D.I. 102 at 6–7. First, plaintiff states it has executed an agreement with Western Fumigation to provide employees on an "as needed" basis. D.I. 98 at ¶ 8. This agreement is expected to result in "substantial revenues." *Id.* Second, in light of projected economic growth, plaintiff also expects to renew placement of temporary employees in Bristol and Fairless Hills, Pennsylvania for K–Mart, Total Warehouse, and Toys–R–Us. *Id.* at ¶¶ 9–10, 12.

Finally, as of September or October of 1993, plaintiff has introduced a medical staffing division—under the ACCU mark—with anticipated sales exceeding $1,000,000 in New Jersey. *Id.* at ¶ 13. When asked at her deposition whether plaintiff had any plans to open offices outside the state, Doris Damm, plaintiff's President, answered: "To my knowledge, no." D.I. 84 at A152. Nonetheless, plaintiff notes it is "in the process of establishing" an area office in Philadelphia, Pennsylvania to service the "many medical facilities" in the area. D.I. 98 at ¶ 13.

## 3. Plaintiff's Advertising Activity

Defendant argues plaintiff's advertising activities are centered upon Southern New Jersey. D.I. 102 at 5. Plaintiff has, in fact, confined its advertisements in the Yellow Pages to Southern New Jersey. D.I. 84 at A104, A153. Further, throughout the disputed areas of Southeastern Pennsylvania and Northern Delaware, defendant notes plaintiff has placed newspaper advertisements solely in the form of "Help Wanted" classifieds seeking temporary employees. D.I. 102 at 7–8. That is, plaintiff does not target prospective customers of its temporary employment services through newspaper advertisements. D.I. 84 at A102–A103, A152–A153.

Plaintiff does not dispute these facts, but points to its recruitment of temporary employees beyond Southern New Jersey. D.I. 98 at ¶¶ 1–2, 5–6, 10. Plaintiff, for example, holds temporary recruiting sessions outside Southern New Jersey, at which one-third to one-half of the attendees are from Pennsyl-

vania or Delaware. *Id.* at ¶¶ 5–6; D.I. 100 at ¶¶ 1–3.

## B. Defendant's Adoption and Use of Its Mark

On May 4, 1992, approximately one month after its incorporation in Florida, defendant was formed through a merger of four independent regional temporary help companies ["the former companies"]. D.I. 47 at ¶ 2. Abacus Services, in business for eighteen years, had grown to a company having annual sales of approximately $12,000,000 and ten offices in Western Pennsylvania, South Carolina and Virginia. D.I. 43 at ¶ 1. ATS Services, in business for fourteen years, had grown to a company having annual sales of approximately $27,000,000 and twenty-three offices in North Carolina and Florida. D.I. 47 at ¶ 3. BSI Temporaries, in business for twenty-one years, had grown to a company having annual sales of approximately $14,000,000 and sixteen offices in Delaware, Illinois, Maryland, and Virginia. D.I. 46 at ¶ 1. Metro Temporaries, in business for seventeen years, had grown to a company having annual sales of approximately $11,000,000 and four offices in Arkansas, Indiana, Kentucky, and Tennessee. D.I. 54 at ¶ 1.

Since the merger, defendant has maintained its principal place of business in Jacksonville, Florida. D.I. 19 at 1. Defendant further states it has become "one of the largest temporary help service companies in the United States," having over forty offices in twelve states. D.I. 47 at ¶ 2. New Jersey is not one of those states. D.I. 46 at ¶ 6; D.I. 85 at ¶ 2. Defendant does, however, have an office in Wilmington, Delaware which "serves the Wilmington metropolitan area." D.I. 46 at ¶ 6. According to plaintiff, this office, "located less than ten ... miles from ... New Jersey," solicits placements for its temporary employment services in New Jersey. D.I. 1 at 4. Defendant, for its part, asserts it has neither conducted any advertising nor placed any temporary employees in New Jersey. D.I. 46 at ¶ 6; D.I. 85 at ¶ 2.

Defendant relates the following account of how it decided to adopt the ACCUSTAFF mark: Before the merger of the former companies, the principals of those companies initiated a process by which they could select a

new name. D.I. 43 at ¶ 2; D.I. 46 at ¶ 2; D.I. 47 at ¶ 4; D.I. 54 at ¶ 2. That process involved a contest among the employees of the former companies who submitted over one hundred potential names, one of which was "AccuStaff Resources." *Id.* Defendant did not select its first choice, "Summit Temporaries," because a trademark search, performed on April 3, 1992, revealed third party uses of that name in the employment services field. D.I. 47 at ¶ 5. Defendant therefore selected its second choice, "AccuStaff Resources." Defendant selected this name because it suggested defendant would provide "temporary employees who would perform their jobs with accuracy." D.I. 43 at ¶ 2; D.I. 46 at ¶ 2; D.I. 47 at ¶ 6; D.I. 54 at ¶ 2.

Defendant states it performed a trademark search for "AccuStaff Resources,"[10] on or around April 8, 1992, which did not reveal any registrations or uses of the ACCU-STAFF mark in the employment services field. D.I. 47 at ¶ 6. Defendant also maintains that search did not "disclose any reference to Plaintiff." D.I. 47 at ¶ 7. Accordingly, defendant claims it had no knowledge of plaintiff or plaintiff's use of the ACCU mark at the time defendant adopted and commenced using the ACCUSTAFF mark. D.I. 82 at 6. Instead, defendant asserts it first learned of plaintiff when defendant received plaintiff's letter, dated July 2, 1992, asking defendant to cease and desist its alleged infringing use. D.I. 43 at ¶ 3; D.I. 46 at ¶ 3; D.I. 47 at ¶ 7; D.I. 54 at ¶ 3.

Plaintiff, in turn, contends defendant knew of plaintiff and its ACCU mark well before it adopted and began using the ACCUSTAFF mark. D.I. 89 at 11–15. As evidence, plaintiff highlights the fact that two of its principals, Doris and Edward Damm, met Delores Kesler ["Kesler"], now defendant's President and Chief Executive Officer, on at least two occasions at professional gatherings before the former companies merged to form defendant. D.I. 99 at ¶ 2. Edward Damm states he first met Kesler in San Diego, California in 1984. D.I. 98 at ¶ 15. The two met again in Chicago, Illinois in 1987, at which time they "exchanged pleasantries." *Id.* at ¶¶ 17–18. Similarly, Doris Damm remembers meeting Kesler twice: first, in Washington,

D.C. in June of 1990; and second, in Maui, Hawaii, in October of 1990. D.I. 99 at ¶¶ 3, 6, Ex. A. On all such occasions, plaintiff's principals recall they were wearing a large name tag prominently featuring the ACCU mark. *Id.* Kesler has acknowledged such meetings may have occurred. D.I. 96 at B22–B23.

Additionally, plaintiff highlights the fact that during the same time period, defendant was a recipient of various documents listing other providers of temporary employment services. In fact, defendant states it consulted such documents before it adopted and began using the ACCUSTAFF mark. D.I. 82 at 17 n. 12. The documents contain references to plaintiff. *Id.* at ¶¶ 3–4, Exhibit ["Ex."] A (alphabetically arranged attendee list for trade organization conference).

The parties are also in disagreement as to when defendant initiated use of the ACCU-STAFF mark. According to defendant, it began using the trademark in connection with the promotion and rendering of its temporary help services immediately following its creation through the merger of the former companies. D.I. 102 at 12. For a transitional period, these uses were typically made in conjunction with the former company names in order to take advantage of the "substantial goodwill" in those names. D.I. 84 at A6–A16. By way of example, defendant highlights six ways in which it used the ACCUSTAFF mark beginning on or around May 4, 1992: (1) defendant answered the phones at many of its offices with the name of one of the former companies followed by "ACCU-STAFF" or the phrase "an ACCUSTAFF company" (D.I. 43 at ¶ 5; D.I. 45 at ¶¶ 2–3; D.I. 46 at ¶ 5; D.I. 47 at ¶ 10; D.I. 50 at ¶¶ 2–3; D.I. 54 at ¶ 4; D.I. 55 at ¶¶ 2–3); (2) defendant mailed letters to its customers announcing its creation under the ACCU-STAFF mark (D.I. 43 at ¶ 6; D.I. 46 at ¶ 5; D.I. 47 at ¶ 11; D.I. 54 at ¶ 4); (3) defendant's sales personnel made sales calls on "many hundreds" of the former companies' customers to explain the ACCUSTAFF mark (D.I. 43 at ¶ 7; D.I. 46 at ¶ 5; D.I. 47 at ¶ 12;

---

**10.** Defendant later dropped the term "Resources" from the "AccuStaff Resources" name because, as it explains, it wanted a short name which would not be abbreviated to an acronym. D.I. 82 at 6 n. 3.

D.I. 54 at ¶ 4); (4) defendant submitted to customers and potential customers proposals for temporary help services using the AC-CUSTAFF mark in conjunction with the former company names (D.I. 43 at ¶ 8; D.I. 47 at ¶ 13; D.I. 46 at ¶ 5); (5) defendant issued press releases announcing the merger and "prominently featuring the ACCUSTAFF name" (D.I. 47 at ¶ 8); and (6) defendant included the ACCUSTAFF mark along with the former company names on stationery, business cards, checks, customer invoices and other forms (D.I. 43 at ¶ 11; D.I. 47 at ¶ 15).

Plaintiff, in turn, asserts defendant did not convert to its new name until at least October 1, 1992, well after it received plaintiff's cease and desist letter dated July 2, 1992. D.I. 89 at 13–15. As evidence, plaintiff points to a document generated by defendant entitled "AccuStaff Business Plan Update," which refers to the goal of converting the regional company names to ACCUSTAFF by January 1, 1993. *See* D.I. 91. Kesler has testified this document refers solely to the signs placed outside the regional offices. D.I. 84 at A9–A11.

### C. Actual Confusion of the Two Marks

Since it commenced using its trademark, defendant notes the parties have not experienced any instances in which consumers of temporary help services have actually confused plaintiff's ACCU mark and defendant's ACCUSTAFF mark, or believed there was some relationship between the companies. D.I. 85 at ¶ 3; D.I. 86 at ¶ 2; D.I. 87 at ¶ 2; D.I. 88 at ¶ 2. Plaintiff, too, has acknowledged there is no evidence of actual consumer confusion. D.I. 84 at A135, A166.

### III. DISCUSSION

#### A. The Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is deemed "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "Material" facts are those which might affect the outcome of the litigation under the applicable law. *Id.* In *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986), the Supreme Court held this language mandates an entry of summary judgment against a party which fails to demonstrate the existence of an element essential to its case on which it will bear the burden of proof at trial.

The party which files a motion for summary judgment bears the initial burden of demonstrating the absence of a genuine issue. When that party does not bear the burden of proof at trial, it is under no obligation to support its motion with affidavits or other evidence negating the claim or defense of its opponent. *Id.* at 323, 106 S.Ct. at 2553. Instead, "the moving party need only establish that there exists no genuine issue of material fact as to any essential element of the nonmovant's claim or defense." *International Union of Heat & Frost Insulators Local 42 v. Absolute Envtl. Servs., Inc.*, 814 F.Supp. 392, 401 (D.Del.1993). The party in opposition to the motion must then "go beyond the pleadings" by supplying certain evidentiary materials such as affidavits. *Id.* 477 U.S. at 324, 106 S.Ct. at 2553. *See* Fed. R.Civ.P. 56(c) ("depositions, answers to interrogatories, and admissions on file, together with the affidavits"). Using those materials, the nonmovant must establish a genuine issue for trial. Fed.R.Civ.P. 56(e).

When the movant does bear the burden of proof at trial, however, "the standard is more stringent." *National State Bank v. Federal Reserve Bank*, 979 F.2d 1579, 1582 (3d Cir.1992). The Third Circuit Court of Appeals has stated that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *Id.* *See also Anchorage Assocs. v. Virgin Islands Bd. of Tax Review*, 922 F.2d 168, 175

(3d Cir.1990) (holding that "[w]here the moving party has the burden of proof on the relevant issues, this means that the district court must determine that the facts specified in or in connection with the motion entitle the moving party to judgment as a matter of law").

In deciding whether a genuine issue of material fact exists, the Court draws all inferences in favor of the nonmovant. In other words, the nonmovant's assertions based on "the underlying facts contained in the evidential sources ... must be taken as true, and when these assertions conflict with those of the movant, the former must receive the benefit of the doubt." *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977) (footnote omitted). In doing so, however, the Court does not resolve any issues of fact which may exist, for "credibility evaluations are inappropriate in deciding a motion for summary judgment." *Country Floors, Inc. v. Gepner*, 930 F.2d 1056, 1061 (3d Cir.1991). Finally, even if the facts are undisputed, summary judgment may not be granted if the parties disagree over what inferences reasonably can be drawn from the facts. *Nathanson v. Medi-*

*cal College of Pa.*, 926 F.2d 1368, 1380 (3d Cir.1991).

## B. Defendant's Good Faith Geographically Remote Trademark Use [11]

The United States Supreme Court, in *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916), announced the principles governing the territorial rights of trademark holders under the common law. In that case, the senior user [12] had marketed its flour under the "Tea Rose" label since 1872, making the majority of its sales in Ohio, Pennsylvania, and Massachusetts. The junior user had marketed its flour under the same label since 1904, making its sales in Mississippi, Alabama, Georgia and Florida. The dispute arose when the senior user learned of the junior user, and in response, asserted nationwide trademark rights. *Id.* at 405–410, 36 S.Ct. at 357–359.

The Court noted that "[i]n the ordinary case of parties competing under the same mark in the same market, it is correct to say that prior appropriation settles the question." *Id.* at 415, 36 S.Ct. at 361. That is, the trademark rights of a senior user

---

**11.** Plaintiff continues to argue that defendant used its mark merely "to establish business reputation, which is trade name usage," and consequently "did not make *service mark* use of the name [ACCUSTAFF] until well after having notice of plaintiff's claims to rights in the ACCU mark." D.I. 89 at 14 (emphasis in original). Whether a name serves as a trademark or service mark, rather than a trade name, is a question of fact to be determined "from the manner in which the name is used and the most probable impact thereof on purchasers and prospective customers." *In re Univar Corp.*, 20 U.S.P.Q.2d 1865, 1866 (T.T.A.B.1991). Various factors are relevant to this inquiry: "whether the name is accompanied by the company address, whether the full corporate name including corporate designer is used, whether the name appears in graphic format that differs from surrounding print, whether the name appears merely to communicate information such as corporate affiliations, and whether the name is used in conjunction with some other symbol or term that functions as a mark." *Accu Personnel, Inc. v. AccuStaff, Inc.*, 823 F.Supp. 1161, 1170 (D.Del.1993) (citing *In re Univar Corp.*, 20 U.S.P.Q.2d at 1168–69; *In re Stewart Sandwiches Int'l, Inc.*, 220 U.S.P.Q. 93, 95–96 (T.T.A.B.1983)). Of course, under certain circumstances, two or more marks may simulta-

neously refer to the same products or services. *See In re Walker Process Equip., Inc.*, 233 F.2d 329, 332 (C.C.P.A.1956). In disposing of the preliminary injunction motion in this case, the Court made extensive reference to the facts relevant to the issue of trademark usage as opposed to trade name usage. *See Accu Personnel*, 823 F.Supp. at 1170–71. The facts have not changed. The facts set forth in the preliminary injunction are adopted *in toto* for purposes of this summary judgment opinion. Based on those facts, the Court holds that no reasonable trier of fact could find defendant had failed to make trademark use of the ACCUSTAFF name by the time plaintiff notified defendant of its alleged infringement of the ACCU name.

**12.** In order to evaluate the geographical extent of trademark rights, a district court must first determine who is the "senior user" and who is the "junior user." The "senior user" is the first to adopt and use a mark anywhere in the country. The "junior user" is the second user, regardless of whether it adopts and uses a mark in a geographically remote location. *See* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 26.01[1] (3d ed. 1992) [hereinafter "McCarthy"].

usually prevail over those of a junior user, where the two uses are of the same or a similar trademark. A special case exists, however, where the users operate in markets which are geographically remote from each other. In such a case, "the question of prior appropriation is legally insignificant, unless at least it appear that the second adopter has selected the mark with some design inimical to the interests of the first user...." *Id.* This conclusion flows from the premise that trademark rights grow "out of use, not mere adoption." *Id.* at 413, 36 S.Ct. at 360. No senior user, therefore, "can monopolize markets that his trade has never reached and where the mark signifies not his goods but those of another." *Id.* at 416, 36 S.Ct. at 361. The Court expressly did not decide the case in which a junior user occupies territory that likely would be reached by a senior user "in the natural expansion of his trade." *Id.* at 420, 36 S.Ct. at 363.

. The Court revisited these principles in *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 94–95, 39 S.Ct. 48, 49–50, 63 L.Ed. 141 (1918), in which the senior user traded medicines under the "Rex" label, initially throughout Massachusetts, and the junior user began marketing similar medicines under the same label in Louisville, Kentucky approximately six years later. In this case, the dispute arose when the senior user actually expanded into the market of the junior user. *Id.* Again, however, mere adoption of the trademark by the senior user was not dispositive. *See id.* at 97–98, 39 S.Ct. at 51 (noting a trademark owner "may not, like the proprietor of a patented invention, make a negative and merely prohibitive use of it as a monopoly"). According to the Court, common law trademark adoption "does not ... project the right of protection in advance of the extension of the trade, or operate as a claim of territorial rights over areas into which it thereafter may be deemed desirable to extend the trade." *Id.* at 98, 39 S.Ct. at 51. Instead, the Court held that one entering a new market must enter subject to the

trademark rights already acquired, in good faith, by another user in that market.[13] *Id.* at 101, 39 S.Ct. at 52.

■■■ These principles, collectively, have come to be known as the "Tea Rose–Rectanus" doctrine. Despite subsequent statutory activity, this doctrine still governs territorial rights in unregistered trademarks. *Wiener King, Inc. v. Wiener King Corp.*, 407 F.Supp. 1274, 1280 (D.N.J.), *rev'd on other grounds*, 546 F.2d 421 (table), 192 U.S.P.Q. 353 (3d Cir.1976) (citing *American Foods, Inc. v. Golden Flake, Inc.*, 312 F.2d 619 (5th Cir.1963)). *See also* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 26.01[4] at 26–9 n. 19 (3d ed. 1992) (citing cases) [hereinafter "McCarthy"]. Thus, "the senior user of a common law mark may not be able to obtain relief against the junior user in an area where [the senior user] has no established trade, and hence no reputation and no good will." *Natural Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1394 (3d Cir.), *cert. denied*, 474 U.S. 920, 106 S.Ct. 249, 88 L.Ed.2d 257 (1985). The geographic scope of trademark rights must be determined upon the facts of each case. *Jacobs v. Iodent Chemical Co.*, 41 F.2d 637, 640 (3d Cir.1930). In the present motion, defendant maintains its use is both geographically remote and in good faith, entitling it to trademark protection. The Court will examine each of the two requirements of the doctrine in turn.

### 1. Geographic Remoteness

■■■ Trademarks operate in geographically remote markets when neither one has penetrated the market of the other. In other words, "the mark means one thing in one market, an entirely different thing in another." *United Drug*, 248 U.S. at 100, 39 S.Ct. at 52. If two or more uses are truly remote, their users can enjoy exclusive areas of trademark protection. *See* 2 McCarthy § 26.01[3]. Courts should not assume such trading areas coincide with state borders.[14]

---

**13.** By holding the expanding senior use was subject to the rights built up by the local junior user, the Court seemed to imply that the junior·user did not occupy the "zone .of natural expansion" of the senior user. *See* 2 McCarthy § 26.08[3].

**14.** Justice Holmes, taking a contrary view, suggested that "if [a trademark] is good in one part of the .State it is good in all." *Hanover Star Milling*, 240 U.S. at 426, 36 S.Ct. at 365 (Holmes, J., concurring). The advantage to this

Instead, courts should evaluate the market penetration of a trademark "on the basis of natural trading areas that may or may not be coextensive with a state's borders." *Natural Footwear*, 760 F.2d at 1398 n. 34.

The Third Circuit Court of Appeals has highlighted four factors courts should consider in determining whether such market penetration is sufficient to warrant trademark protection: "(1) the volume of sales of the trademarked product; (2) the growth trends (both positive and negative) in the area; (3) the number of persons actually purchasing the product in relation to the potential number of customers; and (4) the amount of product advertising in the area." *Natural Footwear*, 760 F.2d at 1398–99. These factors reflect the principle that no senior user can preempt markets "before it actually enters them by advertising, reputation, or actual sales." 2 McCarthy § 26.01[4] at 26–9. Accordingly, courts should evaluate market penetration as of the time the junior user adopted and began using its trademark. *Natural Footwear*, 760 F.2d at 1397.

The degree of market penetration required cannot be precisely defined. According to the. Third Circuit Court of Appeals, a party asserting trademark ownership in a trading area must show. "clear entitle[ment]" to protection of its trademark in a particular market. *Natural Footwear*, 760 F.2d at 1397. In other words, that party must introduce evidence to show its trade-

mark "has achieved market penetration that is 'significant enough to pose the real likelihood of confusion among the consumers in that area.'" *Id.* (quoting *Sweetarts v. Sunline, Inc.*, 380 F.2d 923, 929 (8th Cir.1967)).

At the hearing on the present motion, counsel for plaintiff conceded that, despite bearing the burden of proof,[15] plaintiff has placed no evidence in the summary judgment record relevant to the second and third factors: the growth trends in the disputed areas; and the ratio of actual customers to potential customers, or market share, in those areas. The Court therefore will consider the first and fourth factors in turn. After doing so, should plaintiff have failed to prove it actually has penetrated the disputed markets, the Court will evaluate whether plaintiff is entitled to a "zone of natural expansion."

### a. The Volume of Sales

Whether a volume of sales is significant enough to make consumer confusion likely "will vary with the product and the market." *Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467, 473 (3d Cir.1990). Of course, sales volume must be more than de minimis.[16] "When sales activity does not exceed even a minimum threshold level, a court may properly conclude that market penetration ... simply has not been demonstrated." *Natural Footwear*, 760 F.2d at 1400.[17] In this case, the sum-

approach is that "we get rid of all questions of penumbra, of shadowy marches [sic] where it is difficult to decide whether the business extends to them." *Id.* Although Justice Holmes was undoubtedly correct regarding the "shadowy" factual inquiry into the market penetration of a product or service, his suggestion has been rejected by the Third Circuit Court of Appeals. *See Jacobs v. Iodent Chemical Co.*, 41 F.2d 637, 639–40 (3d Cir.1930).

15. Although the "Tea Rose–Rectanus" doctrine speaks in terms of what the junior user must prove, subsequent cases have indicated that, at least for purposes of the market penetration test, the senior user bears the burden of proving the reputation of its trademark extends into a particular area. *See Natural Footwear*, 760 F.2d at 1403 (holding the junior user "has not demonstrated sufficient market penetration ... to justify a conclusion that it has common law trademark rights" in two disputed areas); *Sweetarts v. Sunline, Inc.*, 436 F.2d 705, 707 (8th Cir.1971)

(noting the appeal presented the question whether plaintiff "has established sufficient market penetration .... to entitle it to injunctive protection"). This may be because the senior user normally has exclusive control of the facts necessary to prove its market penetration.

16. In one case involving clothing sales, for example, the court clarified that "[b]y de minimis, we mean that [plaintiff] achieved neither gross sales of over $5,000 nor a total of over 50 customers for any of these states in at least two of the three years for which sales data were available." *Natural Footwear*, 760 F.2d at 1400.

17. While the Third Circuit Court of Appeals came to this conclusion in the context of a preliminary injunction motion, its statement is no less valid in the context of a motion for partial summary judgment. Sales figures may be so insignificant that, upon a consideration of those figures in conjunction with the other three fac-

mary judgment record is replete with sales information which is largely undisputed. From that information, defendant argues plaintiff's sales in two areas—Southeastern Pennsylvania and Northern Delaware—are so sporadic as to be de minimis. D.I. 82 at 23. Plaintiff, in turn, does not dispute its sales volume in those areas but makes the following two arguments.

 First, plaintiff highlights two categories of sales: those having occurred since defendant initiated use of its alleged infringing trademark; and those which plaintiff anticipates will occur in the near future. D.I. 89 at 5. Both categories, however, are irrelevant as a matter of law. Courts are to evaluate market penetration as of the date the junior user adopted and first used its trademark. *Natural Footwear*, 760 F.2d at 1397. Plaintiff will not be permitted to preempt markets "before it actually enters them by advertising, reputation, or actual sales." 2 McCarthy § 26.01[4] at 26–9.

 Second, plaintiff argues the "natural trading area" in which plaintiff operates is the Delaware Valley, which encompasses Southern New Jersey, Southeastern Pennsylvania and Northern Delaware. D.I. 89 at 7 (quoting *Natural Footwear*, 760 F.2d at 1399 n. 34). Based on its combined sales figures throughout that trade area, plaintiff concludes a rational trier of fact could find plaintiff has penetrated all three of the markets contained in the Delaware Valley. *Id.* The Court does not agree. As the Third Circuit Court of Appeals has stated, "a common law mark is to receive no greater protection than its reputation in any specific area warrants." *Natural Footwear*, 760 F.2d at 1398.

Even using the "Customer Lists" which plaintiff generated over three years, plaintiff enjoyed total sales of $763,243.16 to thirty-four customers which it locates in Southeastern Pennsylvania. D.I. 83 at A88–A92. Expressed as a percentage, 4.026% of plaintiff's total sales ($18,956,125.33) were to customers which plaintiff locates in Southeastern Pennsylvania. After subtracting the sales to

those eighteen customers which are more properly classified in Southern New Jersey, however, plaintiff enjoyed total sales of only $212,545.34 to the remaining sixteen customers properly classified in Southeastern Pennsylvania. *Id.* at A6–A87. The percentage of total sales becomes 1.121%. The picture is even more stark for customers which plaintiff locates in Northern Delaware. Over three years, plaintiff enjoyed total sales of $3,611 to two customers—only .019% of plaintiff's total sales. *Id.*

Plaintiff has introduced evidence suggesting its placement of temporary employees was more successful in these areas for the years preceding this analysis. *See* D.I. 98 at ¶ 7 (estimating the placement of fifty to sixty persons in both Southeastern Pennsylvania and Northern Delaware); *id.* at ¶¶ 9–10 (estimating the placement of forty to sixty persons per week in Southeastern Pennsylvania). The record contains no estimate, however, of the sales which those placements generated. Even accepting this incomplete information as true, plaintiff's sales in the two disputed areas fall short of the de minimis threshold. The first element of the market penetration test, therefore, militates against a finding plaintiff has penetrated the markets of Southeastern Pennsylvania and Northern Delaware.

### b. The Amount of Advertising

 With respect to the fourth element, the Third Circuit Court of Appeals has recognized that "advertising may be very important to the reputation of a product in a given area." *Natural Footwear*, 760 F.2d at 1400. While plaintiff has placed evidence in the record concerning its advertising throughout Southern New Jersey, plaintiff has offered no relevant evidence concerning its advertising in the disputed areas of Southeastern Pennsylvania and Northern Delaware. *See* D.I. 84 at A104, A153. Instead, plaintiff solely relies upon its solicitation in those areas of temporary workers to act as its employees, asserting it is in business "to provide services to two distinct groups of

---

tors, no reasonable jury could find market penetration by the party offering them. In such a case, no genuine issue of material fact remains as to whether the trademarked product has pen-

etrated the relevant market. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

people." D.I. 89 at 3. First, plaintiff maintains it provides temporary employees. to companies in need of temporary help, and second, it provides temporary employment to its employees. *Id.*

If plaintiff is correct, however, every company which hires employees is in the employment services field. This cannot be the case. The Southern District of New York, when faced with an identical argument in a case involving temporary employment services, found such advertisements to potential employees are not probative of market penetration because they "cannot be considered *client* solicitation or promotion of ... services." *Architemps, Inc. v. Architemps, Ltd.,* 704 F.Supp. 39, 40 (S.D.N.Y.1988) (emphasis in original). The Court finds this reasoning persuasive. Thus, an analysis of the fourth element also suggests no market penetration of the disputed trade areas by plaintiff. In sum, plaintiff has not proven its temporary employment services actually have penetrated the markets outside Southern New Jersey.

**c. The "Zone of Natural Expansion"**

■ As McCarthy has noted, however, "[i]f the senior user cannot prove actual sales penetration into the contested area, and cannot prove that the reputation of its mark extends into that area, it may still make a claim that the junior user is located in an area which falls within the senior user's 'zone of natural expansion.'" 2 McCarthy § 26.-08[1] at 26–31. Accordingly, the Court will consider whether plaintiff's trademark is entitled to protection in a "zone of natural expansion." Plaintiff urges its trademark should be granted protection in an expansion zone encompassing Southern New Jersey, Southeastern Pennsylvania, and Northern Delaware—the Delaware Valley. D.I. 89 at 10. Defendant argues the Court should not grant protection in an expansion zone, in part because the "zone of natural expansion" theory has fallen into disfavor. D.I. 102 at 9–10.

While the Third Circuit Court of Appeals has neither embraced nor rejected the "zone of natural expansion" theory, the United States District Court for the District of New Jersey has stated that "a prior user, naturally enough, deserves such protection not only in the immediate area of its current physical plant but also within that area to which it can reasonably be expected to expand." *Wiener King, Inc. v. Wiener King Corp.,* 407 F.Supp. 1274, 1281 (D.N.J.), *rev'd on other grounds,* 546 F.2d 421 (table), 192 U.S.P.Q. 353 (3d Cir.1976). The court, however, did not base its decision on the theory because it found plaintiff had no plans to expand its business. *Id.* at 1281–82. In reversing on other grounds, the Third Circuit Court of Appeals simply accepted this finding without further comment on the "zone of natural expansion" theory. *Wiener King, Inc. v. Wiener King Corp.,* 546 F.2d 421 (table), 192.U.S.P.Q. 353, 355 (3d Cir.1976).

■ Assuming the theory is valid, however, McCarthy correctly notes that "[t]he rub comes when one attempts to define, under the facts, the exact extent of this imaginary 'zone of natural expansion.'" 2 McCarthy § 26.08[1] at 26–31. In fact, "[t]o determine this 'zone of potential expansion' with exactitude is impossible." *Wiener King,* 407 F.Supp. at 1281. Most courts have reacted to inexactitude by giving any such zone a narrow construction. *See* 2 McCarthy § 26.08[1] at 26–31 n. 4 (citing cases). Perhaps the most that can be said is that

> [i]f the senior user has constantly expanded its business by the date of the junior user's adoption of the mark, and if distances are not great, it may be that the senior user is entitled to exclusive rights in a zone of natural expansion which includes the junior user's area, even though no actual sales have yet been made in that area by the senior user.

*Id.* at 26–32. Conversely, "[i]f the senior user is static, and has restricted use to only one small area, ... a good-faith junior user may expand into a nationwide use of the mark, subject only to an exception in the small area occupied by the senior user." 2 McCarthy § 26.08[2] at 26–32. That is, a "mere hope of expansion" is not enough. *Blue Ribbon Feed Co. v. Farmers Union Cent. Exchange, Inc.,* 731 F.2d 415, 422 (7th Cir.1984).

■ Courts must guard against defining a senior user's "zone of natural expan-

sion" as those areas into which it actually expands. *Id.* at § 26.08[3]. To do so would be to eviscerate the "Tea Rose–Rectanus" doctrine, which is based upon the principle that an expanding senior user must give way to the junior user's trademark rights, established in good faith, in a geographically remote area. *See United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 101, 39 S.Ct. 48, 52, 63 L.Ed. 141 (1918); *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 415–16, 36 S.Ct. 357, 361, 60 L.Ed. 713 (1916). Courts must evaluate the senior user's "zone of natural expansion" as of the date the junior user adopted and used its trademark. 2 McCarthy § 26.08[1].

Plaintiff has offered no evidence it planned to expand its business under the ACCU mark as of the date defendant selected and began using the ACCUSTAFF mark. In fact, when asked whether plaintiff had any plans to open offices outside the state of New Jersey as of the date of her deposition, Doris Damm, plaintiff's President, answered: "To my knowledge, no." D.I. 84 at A152. Plaintiff has chosen instead to fill the record with evidence concerning its current expansion activities, which are irrelevant to any "zone of natural expansion." Plaintiff also has highlighted various secondary sources which identify an economic relationship between Southern New Jersey, Southeastern Pennsylvania, and Northern Delaware. Because these areas comprise the Delaware Valley, plaintiff argues "the overwhelming recognition of the Delaware Valley region as a single economic unit certainly could reasonably lead to the inference that the remainder of the region is within the plaintiff's zone of natural expansion." D.I. 89 at 10. Plaintiff's reliance on regional economic relationships, standing alone, is misplaced. The proper inquiry, rather, is into what regions did

plaintiff actually plan to expand at the time defendant adopted and began using its trademark. *See* 2 McCarthy § 26.08[1].

While there is arguably uncertainty as to the continuing validity of the "zone of natural expansion" theory, any doubts are of no moment based upon the facts in the summary judgment record. Plaintiff has failed to adduce any evidence relating to its expansion plans at the time defendant began using its trademark, which is an essential element on which plaintiff will bear the burden of proof at trial. The Court therefore finds plaintiff did not entertain thoughts of expanding its business under the ACCU mark beyond Southern New Jersey on or around May 4, 1992, the date defendant adopted and began using the ACCUSTAFF mark. Plaintiff is not entitled to protection of its trademark in a "zone of natural expansion."

In sum, plaintiff is unable to demonstrate that any of the relevant factors indicate it has sufficiently penetrated any market beyond Southern New Jersey. Accordingly, the Court holds that no reasonable trier of fact could find plaintiff has penetrated the markets of Southeastern Pennsylvania and Northern Delaware.[18] There being no genuine issue of material fact as to this issue, a grant of summary judgment to defendant is proper.

**2. Good Faith**

In order to be entitled to trademark protection under the "Tea Rose–Rectanus" doctrine, defendant must not only be geographically remote, but also must have adopted and used its trademark in good faith. *See* 2 McCarthy § 26.01[4] at 26–10 ("[a] clear majority of the cases applying the common law ... doctrine hold that in order to prove the defense, the junior user must

---

18. Defendant briefly addresses the question whether the trademark used by plaintiff is legally protectible by arguing the trademark is "suggestive and with only intermediate strength." D.I. 102 at 11. The Court, however, need not address the protectibility issue. If the trademark in question is not inherently distinctive, and thus requires proof of secondary meaning in order to warrant protection, the test for geographic remoteness is significantly more stringent than the one applied here. In such a case, the rights of the senior user "are restricted to those trade areas in which its mark had achieved secondary meaning at the time of the junior user's commencement." 2 McCarthy § 26.10 at 26–36. Because plaintiff has failed to demonstrate a genuine issue of material fact remains as to whether it merely has penetrated the disputed markets, the Court need not address whether plaintiff is required to meet the more stringent standard, proving its trademark has achieved secondary meaning in those markets. In short, the issue of protectibility remains for trial.

prove both of two elements") (citations omitted). The meaning of "good faith" in this context, however, is by no means clear. Courts are divided on the question whether a junior user's prior knowledge of the senior user's trademark, standing alone, compels a finding of bad faith. *Compare Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666, 674–75 (7th Cir.1982) (holding knowledge alone compels a finding of bad faith) *with GTE Corp. v. Williams*, 904 F.2d 536, 541 (10th Cir.), *cert. denied*, 498 U.S. 998, 111 S.Ct. 557, 112 L.Ed.2d 564 (1990) (holding knowledge to be merely the first step in the inquiry).[19] As the Court has noted in previous proceedings between these parties, "[t]he Third Circuit Court of Appeals has displayed only ambivalence on the issue." *Accu Personnel, Inc. v. AccuStaff, Inc.*, 823 F.Supp. 1161 (D.Del.1993) (in context of preliminary injunction motion).

The language in the controlling cases may be used to support both views. In *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 410, 36 S.Ct. 357, 359, 60 L.Ed. 713 (1916), the United States Supreme Court noted at the outset the disputed "trademark was adopted and used in good faith without knowledge or notice that the [trademark] had been adopted or used by [the senior user], or by anybody else." The Court went on, however, to hold a geographically remote junior user may build up trademark rights "unless at least it appear that the second adopter has selected the mark with some design inimical to the interests of the first user, such as to take the benefit of the reputation of his goods ... or the like." *Id.* at 415, 36 S.Ct. at 361.

Similarly, the Court in *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 96, 39 S.Ct. 48, 50, 63 L.Ed. 141 (1918), began by noting that the parties had adopted and used their respective trademarks "in perfect good faith, neither side having any knowledge or notice of what was being done by the other." When it applied the doctrine, however, the Court found there to be "no suggestion of a

sinister purpose" on the part of the junior user. *Id.* at 101, 39 S.Ct. at 52. By way of comparison, the Court distinguished a case in which

[t]he evidence showed without dispute that from the beginning of his use of the offending labels the defendant ... had known of the [product sold by plaintiff], and raised at least a serious question whether [the defendant] did not adopt his labels for the purpose of palming off his goods as those of [plaintiff].

*Id.* at 102, 39 S.Ct. at 52. This language suggests a junior user's prior knowledge of other uses should be probative of, but not determinative of, its bad faith.

The cases in this circuit contain similar language. In *Wiener King, Inc. v. Wiener King Corp.*, 407 F.Supp. 1274, 1282 (D.N.J.), *rev'd on other grounds*, 546 F.2d 421 (table), 192 U.S.P.Q. 353 (3d Cir.1976), the United States District Court for the District of New Jersey noted that while the expanding junior user did know of the senior user, "[r]eason and common sense compel the conclusion that the defendants are not seeking to trade upon or profit from the name and reputation of another, the plaintiff." In the broader context of trademark infringement, the Eastern District of Pennsylvania noted that some protection was available as against a defendant acting in bad faith, that is, "where he has selected the name with some design inimical to the interest of the plaintiff." *Safeway Stores, Inc. v. Sklar*, 75 F.Supp. 98, 104 (E.D.Pa.1947). *See also* Restatement (Third) of Unfair Competition § 19, cmt. d (Tent. Draft No. 2, 1990) (refusing to "accord conclusive significance to the subsequent user's knowledge of the prior user").

The Third Circuit Court of Appeals has not yet resolved the question. Although in one early case, the court observed the doctrine was available "unless at least it appear that the second adopter has selected the mark with some design inimical to the interests of the first user," *Adam Hat Stores, Inc. v.*

---

**19.** McCarthy states that a majority of courts have held "good faith" to mean the lack of any such knowledge. 2 McCarthy § 26.03[2] at 26–14 n. 9 (citing cases). He attributes these holdings, in part, to the fact that registered trademark owners are held to such a standard. *Id.* at 26–15. As McCarthy acknowledges, however, "the senior user who has a federal registration has much greater territorial rights than exist at common law." *Id.* § 26.13[2] at 26–49.

*Lefco,* 134 F.2d 101, 104 (3d Cir.1943) (quoting *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 415, 36 S.Ct. 357, 361, 60 L.Ed. 713 (1916)), a later case makes it clear the court has not decided whether prior knowledge, standing alone, constitutes bad faith on the part of the junior user. *See A.J. Canfield Co. v. Honickman,* 808 F.2d 291 (3d Cir. 1986). As plaintiff correctly points out, the court has summarized the "Tea Rose–Rectanus" doctrine as follows:

> [T]he senior user's use of a mark in one region would not suffice to prevent a junior user from using the same mark in a region where the senior user's goods were unknown *so long as the junior user adopted the mark without knowledge of the senior user's mark and thus in good faith.* These cases have given rise to the converse holding, that a senior user has exclusive rights to a distinctive mark anywhere it was known prior to the adoption of the junior user and has enforceable rights against any junior user who adopted the mark with knowledge of its senior use.

*Id.* at 295 n. 4 (emphasis added). The court, however, expressly did not reach the claims relating to bad faith. *See id.* at 296 n. 7 (noting those claims "raise interesting issues concerning the geographic reach of a descriptive mark and the significance of a junior user's knowledge of the senior user's use"). The issue must be resolved here.

▉▉▉ Based upon the foregoing, the Court holds a junior user's prior knowledge of a senior user's trademark use is probative of, but not dispositive of, the question whether the junior user acted in bad faith. *See also Rockland Mortgage Corp. v. Shareholders Funding, Inc.,* 835 F.Supp. 182, 195 (D.Del.1993) ("declin[ing] to attribute to defendant bad faith absent some 'plan antagonistic to [plaintiff's] interests' "). As evidence of bad faith, plaintiff argues defendant initiated and expanded use of its ACCUSTAFF mark knowing plaintiff was using its ACCU mark. Specifically, plaintiff highlights the fact that before defendant selected its trademark, the principals of the two companies met under circumstances which put defendant on notice of plaintiff's use. D.I. 99 at ¶ 2. According to plaintiff, the meetings

took place in 1984, 1987, and 1990. D.I. 98 at ¶¶ 15, 17–18; D.I. 99 at ¶¶ 3, 6, Ex. A. Indeed, Kesler, a principal of defendant, has acknowledged such meetings may have occurred. D.I. 96 at B22–B23. Plaintiff also highlights the fact that during the same time period, defendant reviewed various documents, often arranged in alphabetical order, in which plaintiff and its trademark were listed. D.I. 82 at 17 n. 12; D.I. 99 at ¶¶ 3–4.

In addition, plaintiff contends defendant converted to the ACCUSTAFF mark only after receiving notice that plaintiff considered defendant to be infringing its own ACCU mark. According to defendant, it began the conversion process immediately following its creation through the merger of the former companies. D.I. 84 at A6–A16; D.I. 102 at 12. Plaintiff, however, highlights a document generated by defendant entitled "AccuStaff Business Plan Update," which refers to the goal of converting the regional company names to ACCUSTAFF by January 1, 1993. *See* D.I. 91.

Important for the purposes of this motion are the facts which plaintiff alleges, because the Court must make all inferences in favor of the nonmovant. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Nonetheless, even after making those inferences, the Court finds no reasonable trier of fact could infer that defendant adopted or decided to go forward with the ACCUSTAFF mark, knowing plaintiff was using the ACCU mark and intending to reap some benefit from the goodwill built up in it. There simply is no evidence in the summary judgment record to suggest defendant acted with "some design inimical to the interest of the plaintiff." At most, a reasonable trier of fact could infer that defendant had knowledge of the trademark used by plaintiff, but the evidence demonstrating such knowledge is weak at best. Summary judgment therefore must be granted defendant on this issue.

**C. Plaintiff's Claims Under Delaware Law**

In its complaint, plaintiff asserts state law claims under both the Delaware Act, Del.

Code tit. 6 § 2531 *et seq.* (1974), and the Delaware common law of unfair competition. D.I. 1. Defendant argues these claims must be dismissed because plaintiff has no rights in its trademark in Delaware.[20] .D.I. 82 at 27–28; D.I. 102 at 10. The Court will examine this issue using choice of law principles and substantive law principles.

### 1. Choice of Law Principles

■ In federal civil actions for which state law supplies the rule of decision, federal courts must apply state law. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The question of which state law applies also is governed by state law—the law of the forum State of Delaware. *Klaxon v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 491, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In tort actions such as this, Delaware has adopted the "most significant relationship". test for choice of law. *See. Travelers Indem. Co. v. Lake,* 594 A.2d 38, 47 (Del.1991). That is, the state law which "has the most significant relationship to the occurrence and the parties" will govern. *Id.*

■ Various factors are relevant to this inquiry:

(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and the uniformity of result, and (g) ease in the determination and application of the law to be applied.

*Id.* (quoting Restatement (Second) of Conflict of Laws § 6 (1971)). The following contacts are to be considered when applying these factors:

(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil [sic], residence, nationality, place of incorporation and place of business of the parties,

and (d) the place where the relationship, if any, between the parties is centered. These contacts are to be evaluated according to their relative importance with respect to the particular issue.

*Id.* (quoting Restatement (Second) of Conflict of Laws § 145 (1971)).

■ Although this may be a close case, the majority of the relevant contacts point toward application of the law of Delaware. Plaintiff, in its complaint, alleges injury occurring in "the tri-state area comprising Delaware, New Jersey, and Pennsylvania, with the main focus being in New Jersey,.... as well as elsewhere in the United States." D.I. 1 at 3, 6–7. The injurious conduct which plaintiff features most prominently, however, is that "[d]efendants have stated their intent to begin trading solely as 'ACCUSTAFF' at their Delaware office...." located in the Trolley Square area of Wilmington. *Id.* at 2, 7. As a result of this injurious conduct, plaintiff alleges, the two parties are likely to be in direct competition using confusingly similar trademarks. *Id.* at 7. Defendant has no office in New Jersey. D.I. 46 at ¶ 6; D.I. 85 at ¶ 2.

As for the remainder of the contacts, plaintiff is incorporated in New Jersey, maintaining its principal place of business in Pennsauken, New Jersey. D.I. 1 at 1. Defendant, incorporated in Florida, maintains its principal place of business in Jacksonville, Florida. *Id.* More importantly, as previously mentioned, defendant also has an office in Wilmington, Delaware. *Id.* Finally, to the extent the parties have a "relationship," that relationship appears to be centered around defendant's office in Wilmington, Delaware. As plaintiff alleges in its complaint, "[defendant's] Wilmington, Delaware office is located less than ten ... miles from the State of New Jersey, and it currently solicits employment placements in New Jersey." *Id.* at 4. On balance, then, while the relevant contacts indicate New Jersey may have some interest

---

20; The Delaware Act contains no language restricting the right to its enforcement by plaintiffs who possess trademark rights in Delaware. Further, the Delaware Superior Court has held that in the absence of such clear language, the statute is available to protect any person who has been damaged as a result of the prohibited conduct. *Roberts v. American Warranty Corp.,* 514 A.2d 1132, 1134 (Del.Super.1986) (holding consumers are protected under the statute).

in the litigation, the Court finds a more substantial interest on the part of Delaware.

Based on this choice of law analysis, therefore, the Court finds the relevant contacts indicate the predominant state interests are located in Delaware. In any event, the standards as between federal and state law are substantially similar. As one court has opined, "choice of law presents no real problems, since trademark use is accepted as a general common law requirement, with no discernible differences from jurisdiction to jurisdiction." *Wiener King, Inc. v. Wiener King Corp.*, 407 F.Supp. 1274, 1284 (D.N.J.), *rev'd on other grounds*, 546 F.2d 421 (table), 192 U.S.P.Q. 353 (3d Cir.1976).

### 2. Substantive Law Principles

■ Under the substantive law governing the infringement of unregistered trademarks, a plaintiff must show three elements in order to prevail: "(1) the marks are valid and legally protectible; (2) the marks are owned by the plaintiff; and (3) the defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services." *Opticians Ass'n v. Independent Opticians*, 920 F.2d 187, 192 (3d Cir.1990). Elements (1) and (3) are not the subject of the present motion.

■ Regarding Element (2), the ownership of an unregistered trademark is usually settled by the doctrine of first appropriation. *See Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 292 (3d Cir.), *cert. denied sub nom. Altran Corp. v. Ford Motor Co.*, ——— U.S. ———, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991) ("the first party to adopt a trademark can assert ownership rights, provided it continuously uses it in commerce"). That is, the senior user usually is deemed the owner of the trademark. An

exception exists, however, when a good faith junior user of the same or a similar trademark is geographically remote from the senior user. *See United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 101, 39 S.Ct. 48, 52, 63 L.Ed. 141 (1918); *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 415–16, 36 S.Ct. 357, 361, 60 L.Ed. 713 (1916). This is the "Tea Rose–Rectanus" doctrine. If the junior user cannot show that it is both geographically remote and in good faith, that user is not entitled to the benefit of the doctrine. In other words, the senior user is deemed to own the trademark.[21] Once Elements (1) and (2) are satisfied, then, the resolution of Element (3) will determine whether the junior user is liable to the senior user for infringement. Only if a reasonable consumer is likely to confuse the two marks will plaintiff prevail.

■ The Court has determined above that there is no genuine issue of material fact as to the geographic relationship between the parties. The parties are geographically remote. The Court also has granted summary judgment on the question whether defendant acted in good faith. In other words, there is no genuine issue of material fact as to whether defendant is entitled to the "Tea Rose–Rectanus" doctrine. Defendant is so entitled. As a result, plaintiff is deemed the owner of its trademark solely in Southern New Jersey. At bottom, the verdict after trial will depend upon: first, whether the trademark held by plaintiff is valid and legally protectible; and second, whether consumers are likely to confuse the two trademarks in Southern New Jersey, in all probability due to the alleged actions taken by defendant in Northern Delaware, its closest office to Southern New Jersey. D.I. 46 at ¶ 6. If there is such a likelihood of confusion, plain-

---

**21.** This is true even if the junior user is geographically remote, but has acted in bad faith. It may seem contradictory to give the senior user ownership rights, even in the junior user's remote geographic area, but the cases suggest the doctrine of prior appropriation nonetheless applies. As the United States Supreme Court stated, "where two parties independently are employing the same mark upon goods of the same class, but in separate markets wholly remote the one from the other, *the question of prior appropriation is legally insignificant, unless at least it*

*appear that the second adopter has selected the mark with some design inimical to the interests of the first user....*" *Hanover Star Milling*, 240 U.S. at 415, 36 S.Ct. at 361 (emphasis added).

In practical terms, if the parties are truly remote, defendant will most likely prevail on the third element because plaintiff will be unable to demonstrate likelihood of confusion between the two trademarks. As McCarthy has stated, "[t]he 'remoteness' inquiry is ... an issue of the territorial dimension of likelihood of confusion." 2 McCarthy § 26.01[4] at 26–11.

tiff will have proven a legal harm flowing from conduct prohibited by the Delaware Act. *See* Del.Code tit. 6 § 2532(a)(2–3) (1974) ("[a] person engages in a deceptive trade practice when, in the course of his business ... he ... [c]auses likelihood of confusion...."). In other words, plaintiff will have properly asserted its claims under the law of Delaware. Based on this substantive law analysis, a dismissal of the state law claims advanced by plaintiff would be improper because there exists a genuine issue of material fact concerning their applicability to the disputed conduct in this case. Summary judgment will be denied defendant on this issue.

### D. Plaintiff's Entitlement to Various Remedies

Plaintiff asserts an entitlement to actual damages, an accounting of profits, increased damages, punitive damages, treble damages and attorneys' fees, pursuant to both federal and state law. D.I. 1 at 9–10. Defendant, in turn, contends plaintiff has no such entitlement. Section 35 of the Lanham Act, as amended by the Trademark Law Revision Act, provides:

When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, or a violation under section 43(a) shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled ... to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual dam-

ages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

15 U.S.C. § 1117(a) (1988) (codified as amended by the Trademark Law Revision Act of 1988, Pub.L. No. 100–667, 102 Stat. 3935 (1988)).[22] Plaintiff also asserts it is entitled to certain remedies under state law, particularly treble damages and attorneys' fees as provided under the Delaware Act. *See* Del.Code tit. 6 § 2533 (1974). That statute provides, in relevant part:

(b) The court in exceptional cases may award reasonable attorneys' fees to the prevailing party. Costs or attorneys' fees may be assessed against a defendant only if the court finds that he has wilfully engaged in a deceptive trade practice.

(c) The relief provided in this section is in addition to remedies otherwise available against the same conduct under the common law or other statutes of this State. If damages are awarded to the aggrieved party under the common law or other statutes of this State, such damages awarded shall be treble the amount of the actual damages proved.

*Id.* According to the Delaware Supreme Court, this act simply codifies the state common law of unfair competition. *Young v. Joyce*, 351 A.2d 857, 859 (Del.1975). Although the federal and state standards are substantially similar, differing legal standards govern the types of remedies plaintiff

---

**22.** Prior to its amendment, which became effective November 16, 1989, Section 35 of the Lanham Act applied only to violations of the trademark rights of a "registrant of a mark registered in the Patent and Trademark Office." Section 35 now covers common law trademark violations as well. As McCarthy notes, the statutory change "codified the nearly unanimous rule of the

cases" interpreting that section. 2 McCarthy § 27.05[1][b] (citing cases). *But see Standard Terry Mills, Inc. v. Shen Mfg. Co.*, 803 F.2d 778, 782 (3d Cir.1986) (expressing doubts whether the court should rectify congressional oversight in failing to provide for unregistered trademark violations).

seeks. Accordingly, the Court will address each type of remedy in turn.

### 1. Actual, Increased, Treble and Punitive Damages and an Accounting of Profits

 In order to be awarded actual damages as a result of trademark infringement, plaintiff must show at least some instances of actual consumer confusion. *International Election Systems Corp. v. Shoup,* 452 F.Supp. 684, 712 (E.D.Pa.1978), *aff'd mem.,* 595 F.2d 1212 (3d Cir.1979). The same principle governs the accounting of profits. *See Caesars World, Inc. v. Venus Lounge, Inc.,* 520 F.2d 269, 274 (3d Cir.1975) (" 'damages' means an award based on either actual damages to the plaintiff or actual profits of the infringer, measurable in dollars and cents"). At the hearing on the present motion, however, plaintiff acknowledged it has placed no evidence in the record relating either to: (1) actual harm it has suffered; or (2) actual profits defendant has gained as a result of the alleged acts of infringement. Instead, plaintiff urges such damages remain "an open question." D.I. 89 at 16. In other words, plaintiff maintains it "should not be barred from presenting evidence of such damages at trial as such evidence become[s] available." *Id.*

 The weight of authority clearly suggests the contrary. A court must enter summary judgment against a party which fails to demonstrate the existence of an element essential to its case on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Because plaintiff bears the burden of proving its actual damages at trial, and because plaintiff has failed to adduce any evidence suggesting it actually has been damaged, summary judgment must be granted defendant. Plaintiff is not entitled to an award of either actual damages or actual profits gained by defendant.

 The fact plaintiff has not proven actual damages controls its entitlement to an award of increased damages, punitive damages, and treble damages as well. Section 35 of the Lanham Act provides for increased damages as follows: "In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." 15 U.S.C. § 1117(a) (1988). The Third Circuit Court of Appeals has held this section "assumes an evidentiary basis for the award of some actual damages." *Caesars World,* 520 F.2d at 273. In that case, after searching for evidence adduced by plaintiff relating to its actual damages, the court concluded: "We have found none. Three times zero is zero." *Id.* See also *Donsco, Inc. v. Casper Corp.,* 587 F.2d 602, 607 (3d Cir.1978) (finding that although the district court was "apparently under the misapprehension that reasonable damages could be assessed without regard to actual damages.... such a method of assessment is impermissible"). Plaintiff therefore has no entitlement, as a matter of law, to increased damages.

 Nor may plaintiff be awarded punitive damages, to the extent they differ from increased damages. The Lanham Act cautions that any sum awarded pursuant to Section 35 "shall constitute compensation and not a penalty." 15 U.S.C. § 1117(a) (1988). Interpreting this provision, the Third Circuit Court of Appeals expressed its misgivings about any award of punitive damages under federal law. That court went on to hold that "[i]f the record in the district court contains no evidence of actual damage or actual profit in dollars and cents no monetary award may be made ... and the trademark owner must be content with injunctive relief." *Caesars World,* 520 F.2d at 274. State law governing punitive damages yields the same result. In Delaware, an "award of punitive damages can not [sic] be made unless the plaintiff also receives compensatory damages." *Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1077 (Del.1983).[23] Because the record in this case

---

**23.** Had plaintiff proven it was actually damaged, it would have been entitled to punitive damages only if the infringing actions were found to be "gross, oppressive, or aggravated" or found to involve "breach of trust or confidence," and then only in an amount "reasonably proportionate to the actual damages." *Id.* at 1076–77.

contains no proof of actual damages, plaintiff is not entitled to compensatory damages. Consequently, plaintiff may not be awarded punitive damages.

■ Finally, the absence of evidence in the record suggesting actual damages prevents plaintiff from recovering treble damages under Section 2533(c) of the Delaware Act. That section provides that "[i]f damages are awarded to the aggrieved party under the common law or other statutes of this State, such damages awarded shall be treble the amount of the actual damages proved." Del.Code tit. 6 § 2533(c) (1974). By its own terms, the statute makes an award of actual damages a prerequisite of any award of treble damages. The Court may not award either remedy in this case.

In sum, plaintiff has failed to place any evidence in the record concerning an essential element of its damages case, that is, the actual harm it suffered as a result of the alleged infringing acts by defendant. Because plaintiff bears the burden of proving that harm occurred, plaintiff has no entitlement to actual damages, an accounting of profits, increased damages, punitive damages, or treble damages. Summary judgment as to the availability of these remedies must be granted defendant.

### 2. Attorneys' Fees

■ In 1975, Congress amended Section 35 of the Lanham Act to permit the award of attorneys' fees to the "prevailing party," but specified that such an award should be made only in "exceptional" cases. 15 U.S.C. § 1117(a) (1988) (codified as amended by Pub.L. No. 93–600, § 3, 88 Stat. 1955 (1975)). The statute itself does not define the term "exceptional." According to the Senate Report, however, attorneys' fees should be awarded where the infringing acts "can be characterized as 'malicious,' 'fraudulent,' 'deliberate,' or 'willful.'" Ferrero U.S.A., Inc. v. Ozak Trading, Inc., 952 F.2d 44, 47 (3d Cir.1991) (quoting S.Rep. No. 1400, 93d Cong., 2d Sess. 2 (1974), reprinted in 1974 U.S.C.C.A.N. 7132, 7133). The Third Circuit Court of Appeals has adopted this standard. Id. See Standard Terry Mills, Inc. v. Shen Mfg. Co., 803 F.2d 778, 782 n. 7 (3d Cir.1986). The Delaware Act contains a similar provision. See Del.Code tit. 6 § 2533(b) (1974) ("[t]he court in exceptional cases may award reasonable attorneys' fees to the prevailing party. Costs or attorneys' fees may be assessed against a defendant only if the court finds that he has wilfully engaged in a deceptive trade practice.").

■ As for what conduct may be deemed malicious, fraudulent, deliberate or willful, courts are to make "a finding of culpable conduct on the part of the losing party, such as bad faith, fraud, malice, or knowing infringement, before a case qualifies as 'exceptional.'" Ferrero, 952 F.2d at 47. The Third Circuit Court of Appeals cited with approval the approach taken by one district court, which held a prevailing party must show bad intent on the part of defendant. Id. at 48 (quoting Jones Apparel Group, Inc. v. Steinman, 466 F.Supp. 560, 564 (E.D.Pa. 1979)). Specifically, "it must be demonstrated that the 'defendant intended to pass off' goods he was selling as those manufactured by the plaintiff, and '[a] strong showing would seem [to be] required to warrant a finding of intentionality.'" Id. Some courts also have declined to award attorneys' fees when the prevailing party fails to demonstrate actual harm. Id. See, e.g., Hindu Incense v. Meadows, 692 F.2d 1048, 1052 (6th Cir.1982); VIP Foods, Inc. v. Vulcan Pet, Inc., 675 F.2d 1106, 1107 (10th Cir.1982). In any event, district courts are to make explicit findings which provide a reasoned basis for awarding, or declining to award, attorneys' fees. Ferrero, 952 F.2d at 48.

In this case, plaintiff asserts it "has presented evidence sufficient to support a factual finding after full trial of a lack of good faith" by defendant. D.I. 89 at 16. As noted previously, that evidence relates to whether defendant initiated and expanded its junior use knowing of plaintiff's senior use. See D.I. 91 (business plan of defendant setting late date as goal for conversion to the new trademark); D.I. 99 at ¶ 2 (concerning early meetings between the principals of the two companies); D.I. 99 at ¶¶ 3–4 (concerning documents which defendant consulted when selecting its trademark). Even after drawing all inferences from the facts in favor of

plaintiff, however, the Court finds plaintiff is unable to demonstrate the alleged infringing conduct rose to the intentionality level required to be considered malicious, fraudulent, deliberate or willful. The evidence in the summary judgment record simply does not show the requisite level of intentionality required to award attorneys' fees. At most, a reasonable trier of fact could infer that defendant had knowledge of the trademark used by plaintiff. In fact, however, as noted previously, the evidence demonstrating such knowledge existed is weak at best. Summary judgment will be granted defendant as to the availability of this remedy.

## IV. CONCLUSION

The Court will grant in part and deny in part defendant's motion for partial summary judgment. Summary judgment will be granted defendant as to: (1) whether defendant made geographically remote, good faith use of its trademark; (2) whether plaintiff is entitled to actual damages, an accounting of profits, increased damages, punitive damages and treble damages; and (3) whether plaintiff is entitled to attorneys' fees. Summary judgment, however, is inappropriate and will be denied defendant as to whether plaintiff properly brings claims under the law of Delaware.

An appropriate order will issue.